**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **MALIKAH ASANTE-CHIOKE** | **CIVIL ACTION NO. 22-4587** |
| **VERSUS** | **JUDGE CARL J. BARBIER** |
| **NICHOLAS DOWDLE, JONATHON DOWNING, GERARD DUPLESSIS, OFFICER JOHN DOES, COL. LAMAR A. DAVIS, AND CAPTAIN TERRY DURNIN** | **MAG JUDGE MICHAEL NORTH** |

<u>**SECOND AMENDED COMPLAINT**</u>

Plaintiff, Malikah Asante-Chioke, individually, and on behalf of her father, Jabari Asante-Chioke, herein files this action against the defendants named below, who respectfully amends and entirely restates the claims alleged in her Amended Complaint with Jury Demand (Rec. Doc. 22). This Second Amended Complaint with Jury Demand supersedes and completely replaces Plaintiff's Amended Complaint with Jury Demand (Rec. Doc. 22). Plaintiff respectfully represents as follows:

**INTRODUCTION**

1.     This suit involves the unnecessary use of excessive force by police officers on a Black man experiencing a mental health crisis.

2.     On November 21, 2021, during a mental health crisis, Mr. Jabari Asante-Chioke encountered Louisiana State Police ("LSP") Officer Nicholas Dowdle, and East Jefferson Levee District ("EJLD") Officers Jonathon Downing, and Gerard Duplessis (all three referenced herein and collectively as "Officer Defendants").

3.     But rather than approaching Mr. Asante-Chioke to respectfully inquire as to his circumstances or current level of distress, the Officer Defendants did the opposite. The ill-trained,

ill-disciplined, and ill-supervised Officer Defendants failed to follow state and federal law when they used lethal methods during the encounter. Rather than follow the law, the officers chased Mr. Asante-Chioke, screamed at him, and threatened to kill him multiple times, exacerbating the situation and further alarming Mr. Asante-Chioke who by then feared for his life.

4.      Tragically, the scene ended in a firing squad when the Officer Defendants shot Mr. Asante-Chioke twenty-four times in an unjustifiably excessive application of deadly force. Many of the gunshots suffered by Mr. Asante-Chioke impacted him after he was disarmed, heavily wounded, and otherwise incapacitated.

5.      Each shot after Mr. Asante-Chioke was incapacitated reflects a separate instance of excessive force and, at a minimum, negligence on the part of the Officer Defendants. Official government data shows that mental health disorders are a factor in as many as 1 in 2 fatal law enforcement encounters.[1] Between one-third and one-half of all people killed by police have a disability,[2] and almost a quarter of all people killed by police officers in America have had a known mental illness.[3] Mr. Asante-Chioke is a casualty of the callousness with which police treat people with disabilities.

6.      Here, rather than respond to a man in mental distress with support and de-escalation tactics, the Officer Defendants responded with a violent struggle for control and domination despite the fact that Mr. Asante-Chioke had violated no law – as Louisiana is an open carry state where the open carrying of firearms in many public places is expressly legal. Mr. Asante-Chioke's

---

[1] Clifford, K. (2013). Mental health crisis and interventions and the politics of police use of deadly force. In D. Chappell (Ed.), Policing and the mentally ill: International perspectives (pp. 171–195). Boca Raton, FL: CRC Press.
[2] Doris A. Fuller et al., Overlooked in the Undercounted: The Role of Mental Illness in Fatal Law Enforcement Encounters (Arlington, VA: Treatment Advocacy Center, 2015),
https://www.treatmentadvocacycenter.org/storage/documents/overlooked-in-the-undercounted.pdf.
[3] Eric Westervelt, *Mental Health And Police Violence: How Crisis Intervention Teams Are Failing*, NPR (2020) https://www.npr.org/2020/09/18/913229469/mental-health-and-police-violence-how-crisis-intervention-teams-are-failing.

death is yet another representation of the failure of law enforcement agencies to properly utilize and provide training on de-escalation techniques when dealing with persons experiencing severe emotional and mental distress, and how officers often immediately—instinctually—resort to deadly force as a first, rather than last, option when interacting with Black people and people of color.

7.    LSP, one of the two agencies involved in this violent attack, has a long history of violence, discrimination, and police misconduct against Black people and people of color.[4]  In 2019, 49-year-old Ronald Greene was killed by LSP officers during an arrest and violent beat down.  A subsequent cover-up by LSP sparked national outrage and multiple calls for a federal Department of Justice ("DOJ") probe.[5]  Moreover, external investigations have revealed a long pattern of racist violence and corruption by LSP, including questionable investigations of other police departments', including EJLD, unlawful use of force.[6]

8.    On June 9, 2022, the DOJ officially opened a "pattern and practice" investigation into LSP regarding racially discriminatory policing practices in cases of excessive force, stating in a news release that "[t]his civil investigation will assess whether LSP uses excessive force and whether it engages in racially discriminatory policing.  The investigation will include a comprehensive review of LSP policies, training, supervision, and force investigations, as well as LSP's systems of accountability, including misconduct complaint intake, investigation, review,

---

[4] *See, e.g.*, Timothy Bella, *State troopers texted about the 'whoopin' they gave a Black man, records show:  'He's gonna have nightmares,'* The Washington Post (Mar. 13, 2021, 4:29 PM),
https://www.washingtonpost.com/nation/2021/03/13/louisiana-police-black-man-text; Jim Mustian et al., Beatings, buried videos a pattern at Louisiana State Police, AP News (Sept. 8, 2021), https://apnews.com/article/police-beatings-louisiana-video-91168d2848b10df739d73cc35b0c02f8.
[2] Alanah Odoms et al., Pattern-or-Practice Investigation into Louisiana State Police, ACLU Louisiana (Aug. 27, 2021), https://www.laaclu.org/sites/default/files/8.27.21_letter_to_doj_re_lsp_investigation.pdf (hereinafter "Aug. 27, 2021 ACLU-LA Letter").
[6] *Id.*

disposition, and discipline."[7]  Ronald Greene's death, along with countless other less publicized cases, shed light on the rampant misconduct and brutality that has plagued LSP for years.[8]

9.     A review by the Associated Press of internal records and videos related to at least a dozen cases revealed that, over the past decade, LSP officers or supervisors ignored or concealed evidence of beatings, including turning off body cameras, rubberstamping use-of-force reports without reviewing body camera footage, and lying about suspects being violent to justify use of excessive force.[9]

10.     EJLD has also found itself in the crosshairs of unlawful use of force accusations, wherein various persons allege that EJLD officers needlessly escalated encounters with people of color and before applying excessive force.[10]

11.     Individuals with mental illness make up a disproportionate number of those killed at the very first step of the criminal justice process, and Mr. Asante-Chioke's unfortunate death is yet another representation of the failure of law enforcement agencies to utilize de-escalation techniques and training when dealing with persons suffering from severe mental illness.

12.     Mr. Asante-Chioke is just one of many other victims who has suffered violence at the hands of LSP and the EJLD.  Now Plaintiff, Mr. Asante-Chioke's surviving child, seeks to hold these officers accountable for violating Mr. Asante-Chioke's constitutional rights by using excessive force against him, and brutally taking his life without legal justification.

---

[7] U.S. Dep't of Justice, *Justice Department Announces Investigation of the Louisiana State Police*, Office of Public Affairs: Justice News (June 9, 2022), https://www.justice.gov/opa/pr/justice-department-announces-investigation-louisiana-state-police.
[8] Jim Mustian, AP: Use of slurs not 'isolated' at Louisiana State Police, AP News (Oct. 30, 2020), https://apnews.com/article/race-and-ethnicity-louisiana-baton-rouge-racial-injusticed7f77f196571892d71bd010ce4109677.
[9] Beatings And Buried Videos Are A Pattern With The Louisiana State Police, NPR (Sept. 9, 2021), https://www.npr.org/2021/09/09/1035446605/louisiana-state-police-bodycam-videos-beatings.
[10] *See: Deanna Thomas v. Officer Robert Tewis, et al.* ELDA 2:21-cv-00698.

## JURISDICTION AND VENUE

13.    This action is brought pursuant to 42 U.S.C. section 1983 and the laws of the State of Louisiana.  This Court has jurisdiction over this action under 28 U.S.C. sections 1331, 1343, and 1988.

14.    Plaintiff further invokes this Court's supplemental jurisdiction pursuant to 28 U.S.C. section 1367 to adjudicate claims arising under state law because they are derived from the same common nucleus of operative fact as the federal claim.

15.    Venue is proper in the Eastern District of Louisiana under 28 U.S.C. section 1391 as a substantial part of the events or omissions of which Plaintiffs complain occurred in Jefferson Parish, Louisiana, which sits in this Court's jurisdiction.

## PARTIES

16.    Plaintiff is the surviving, lawful and biological descendant of decedent Mr. Asante-Chioke and appears individually as Mr. Asante-Chioke's surviving daughter.

### *Officer Defendants*

17.    **Defendant Officer Nicholas Dowdle** was at all pertinent times acting under the color of state law and the authority of the Louisiana State Police, and, upon information and belief, is a citizen within this Court's jurisdiction.  Defendant **Nicholas Dowdle** is named in his individual capacity and is liable jointly, severally, and *in solido* with the other defendants for the unconstitutional and tortious conduct set forth below in those claims in which he is named.

18.    **Defendant Officer Jonathon Downing** was at all pertinent times acting under the color of state law and the authority of the East Jefferson Levee District Police Department, and, upon information and belief, is a citizen within this Court's jurisdiction.  Defendant **Jonathon Downing** is named in his individual capacity and is liable jointly, severally, and *in solido* with the

other defendants for the unconstitutional and tortious conduct set forth below in those claims in which he is named.

19.    **Defendant Officer Gerard Duplessis** was at all pertinent times acting under the color of state law and the authority of the East Jefferson Levee District Police Department, and, upon information and belief, is a citizen within this Court's jurisdiction. Defendant **Gerard Duplessis** is named in his individual capacity and is liable jointly, severally, and *in solido* with the other defendants for the unconstitutional and tortious conduct set forth below in those claims in which he is named.

20.    At all times relevant hereto, **Defendant John Doe Officers** ("Defendant John Does") were officers at LSP or EJLD. Plaintiff is not aware of the true names of Defendant John Does, and therefore sues them by such fictitious name. On information and belief, Defendant **John Does** reside in the Eastern District of Louisiana. Defendant **John Does** are sued in their individual capacity, and at all relevant times, they were acting under the color of law of the State of Louisiana. Plaintiff will amend this complaint to state the true name of Defendant **John Does** when they have been ascertained.

*Supervisor Defendants*

21.    Until January 8, 2024, **Defendant Colonel Lamar A. Davis** served as the Superintendent of the Louisiana State Police, and, upon information and belief, is a citizen within this Court's jurisdiction. Defendant **Lamar A. Davis** is named in his individual capacity. Defendant **Lamar A. Davis** was at all pertinent times acting under the color of state law and the authority of the Louisiana State Police.

22.    **Defendant Captain Terry Durnin** served as the acting Police Superintendent of the East Jefferson Levee District Police Department at the times relevant to this action, and, upon

information and belief, is a citizen within this Court's jurisdiction. Plaintiff served a public records request on the EJLD to request the identity of the Police Superintendent at the times relevant to this action. The Human Resources Director for the Southeast Louisiana Flood Protection Authority-East, which oversees the EJLD PD, provided a sworn declaration stating that the position was vacant on that date. However, upon information and belief[11], Supervisor Defendant **Terry Durnin** served as the acting Police Superintendent at the times relevant to this action. Supervisor Defendant **Terry Durnin** is named in his individual capacity and was at all pertinent times acting under the color of state law and the authority of the EJLD.

## FACTS

### Initial Encounter

23.  On November 21, 2021, at approximately 10:00 PM, Mr. Asante-Chioke, a 52-year-old Black man, was spotted by a concerned citizen at the intersection of Airline Drive and North Causeway Boulevard in Jefferson Parish, Louisiana.

24.  Mr. Asante-Chioke was visibly distressed and was traveling along the highway on foot carrying in his hands what was later identified as a gun and a knife.

25.  The passer-by who saw Mr. Asante-Chioke thought he might be experiencing a mental health crisis and subsequently flagged down a police officer directing traffic around a nearby construction site and alerted that police officer of the presence of the visibly distressed Mr. Asante-Chioke.

26.  Two Louisiana State Police Department ("LSP") officers and two East Jefferson Levee District Police Department officers, including Officers Dowdle, Downing, and Duplessis,

---

[11] On December 27, 2023 (Duplessis), and on January 2, 2024 (Downing) Defendants served identical responses to Plaintiff's Interrogatory No. 22 stating, "I believe that Terry Durnin was the acting superintendent of the East Jefferson Levee District Police at the time." Exs. 1 & 2.

located Mr. Asante-Chioke at the intersection under the bridge and parked their vehicles along the Airline Drive roadway.

27.     The officers then attempted to approach and apprehend Mr. Asante-Chioke as he jogged slowly away from them southbound in the northbound lanes of U.S. Highway 61.

*The Chase*

28.     Witnesses driving by the scene caught via cellphone video the critical fifty-seven second segment of the interaction between Mr. Asante-Chioke and police officers where he was fatally shot.  The video was later uploaded by the filming witness to the social media platform Instagram with a caption that read "Omg Be [sic] Could Have Been A Person With Mental Health Problems."

29.     The video footage—filmed from a car traveling in the westbound lane of Airline Drive—begins where Mr. Asante-Chioke slowly jogging westbound along the edge of the eastbound lane.  At one point, Mr. Asante-Chioke was observed putting the gun he was carrying to his own head.

30.     In the background a cacophony of officers are screaming continuously for Mr. Asante-Chioke to "get on the ground."  One exasperated officer screams as Mr. Asante-Chioke slowly jogs away from him, "you better fucking stop!" and then, "get on the fucking ground!  I swear to God I'll fucking shoot you!"  Another officer is heard screaming "I will fucking kill you!"

31.     The next frames of the video show that approximately fifty feet in front of Mr. Asante-Chioke, parked in the middle of the eastbound lane, was a white police truck with its emergency lights flashing.

32.     One officer is seen exiting on the driver's side of the vehicle as Asante-Chioke jogs past the vehicle, and another officer is standing at the back bed of the truck pointing his weapon at Mr. Asante-Chioke.

33.     The officer at the truck instructed Mr. Asante-Chioke to "get on the ground" twice while the officer standing at the truck bed also clearly stated, "get on the ground" twice as Mr. Asante-Chioke approached and slowly jogged past.

34.     The third officer then comes into the frame where the truck is, jogging behind but toward Mr. Asante-Chioke, about ten feet width distance away and twenty feet behind him.  Once Mr. Asante-Chioke clears the truck he slows to a walk, still walking away from the scene with his head to the ground.

35.     The officer in pursuit stopped about 10 feet from Mr. Asante-Chioke and advanced, stepping forward with his weapon sharply drawn and pointed at Mr. Asante-Chioke.  This officer screamed again "get on the ground."

### The Failure to Deescalate

36.     Upon this command Mr. Asante-Chioke, without turning or making any direct eye contact, raised his arms parallel to the ground and then dropped them before raising his right arm with the gun in hand in the direction of the third officer.

37.     When Mr. Asante-Chioke's right arm reached a forty-five-degree angle the third officer opened fire on Mr. Asante-Chioke.

38.     Almost immediately, Mr. Asante-Chioke dropped the gun in his hand, and was no longer armed or a threat.  Nevertheless, the officers continued to fire at Mr. Asante-Chioke.

*Death, Autopsy, & Aftermath*

39.     After suffering several bullet wounds, Mr. Asante-Chioke fell to the ground. Nevertheless, officers continued to fire their weapons at Mr. Asante-Chioke, even as he was incapacitated as he was slumped over and motionless on the ground.

40.     A subsequent investigation conducted by Louisiana State Police determined that a total of thirty-six rounds were fired by Defendants Dowdle, Downing, and Duplessis at Mr. Asante-Chioke.

41.     A subsequent autopsy of Mr. Asante-Chioke revealed that he was shot twenty-four times.  He had six gunshot wounds on his right and left arms, eight gunshot wounds on his right and left legs, and ten gunshot wounds on his torso.

42.     These gunshots fractured his left leg; fractured his ribs, pierced his lungs, and caused a litany of other fatal wounds.

43.     A spokesperson for LSP stated publicly in a news broadcast that the officer who initially shot at Mr. Asante-Chioke attempted to tase him, but the results of the autopsy revealed that Mr. Asante-Chioke's body did not have marks consistent with taser use.

*Jefferson Parish's History of Racial Discrimination*

44.     The abuse that Mr. Asante-Chioke endured at the hands of EJLD PD is a continuation of a history and pattern of intentional discriminatory treatment that he and many people in Jefferson Parish's Black community continually confront.

45.    Sheriffs have immense power in Louisiana.[12]  Harry Lee, who served as Jefferson Parish Sheriff for nearly three decades (until 2007), stated that "[t]he sheriff of [Jefferson Parish] is the closest thing there is to being a king in the U.S."[13]

46.    The mentality that the Sheriff of Jefferson Parish is akin to a monarch[14] has enabled JPSO and EJLD PD to unapologetically effectuate policing tactics that are inherently anti-Black, and that accordingly disproportionately affect the Black community—sometimes resulting in death.[15]

47.    Harry Lee was overtly anti-Black, and his beliefs are woven into current policing tactics in Jefferson Parish.  After Hurricane Katrina caused a spike in crime in Jefferson Parish, Lee stated, "[w]e know where the problem areas are.  If we see some black guys on the corner milling around, we would confront them."[16]  At a time when robberies broke out in the Parish, with people being targeted in their driveways, Lee "vowed to stop and question blacks driving 'rinky-dink cars' in white neighborhoods."[17]  Additionally, on another occasion, while addressing crime in the Parish, Lee told a reporter that "[w]e know the crime is in the black community.  Why

---

[12] Lisa Riordan Sevilly and Hannah Rappleye, *A sheriff's deputy shot a 14-year-old boy. It went unreported for months*, NBC News, Jul. 16, 2020, https://www.nbcnews.com/news/us-news/sheriff-s-deputy-shot-14-year-old-boy-it-went-n1234057.

[13] John Burnett, *Larger-Than-Life Sheriff Rules Louisiana Parish*, NPR, Nov. 28, 2006, https://www.npr.org/templates/story/story.php?storyId=6549329.

[14] See Christopher Tidmore, *From beating Lee to becoming Sheriff, Newell Normand retires,* The Louisiana Weekly, Jul. 31, 2017, http://www.louisianaweekly.com/from-beating-lee-to-becoming-sheriff-newell-normand-retires/ ("The Sheriff of Jefferson Parish is the closest thing to an elected medieval king that exists in the United States. He not only is the tax collector for all other parochial offices, but he has exclusive control of his own budget, as well as the hiring and firing of his own officers.").

[15] Loyola University New Orleans College of Law, *Louisiana Deaths Behind Bars 2015-2019*, Incarceration Transparency, June 2021,https://www.incarcerationtransparency.org/wp-content/uploads/2021/06/LA-Death-Behind-Bars-Report-Final-June-2021.pdf. (In Louisiana, Black people comprised 58.40% of the 786 incarcerated people who died behind bars from 2015-2019, despite being only about 32% of the state population.); Jefferson Parish, Incarceration Transparency (2021), https://www.incarcerationtransparency.org/?page_id=37. (Black people comprised almost half of the deaths that occurred at Jefferson Parish Correctional Center, despite being only about 26% of the Jefferson Parish population.).

[16] John Burnett, *Larger-Than-Life Sheriff Rules Louisiana Parish*, NPR, Nov. 28, 2006, https://www.npr.org/templates/story/story.php?storyId=6549329.

[17] *Id.*

should I waste time in the white community?"[18]  In 2006, Lee stated, in regard to a new plan on crime in the Parish: "We're only stopping black people."[19]

48.    Lee, and his views, were popular in the Jefferson Parish community, as evidenced by his nearly thirty-year reign, during which he was re-elected seven times.[20]  "[Lee's] popularity depend[ed], to some extent, on the perception that he [was] a white man's champion, [that] he [was] holding back the black hordes that might otherwise threaten suburban bliss."[21]

49.    Over the years, many officers who serviced under Lee at the Jefferson Parish Sheriff's Office have gone on to also serve in the EJLD.

50.    The incidents of violence perpetuated by officers in Jefferson Parish have a quantifiable discriminatory impact on the Black community.  These well-settled policies, practices, and customs disproportionately subject Black people to excessive violence and in some cases, death.  "'The Black community . . . fear[s] the Jefferson Parish Sheriff's Office,'"[22] and this fear is justified.  The proclivities of the Jefferson Parish Sheriff's Office matter in this case because several officers that were previously employed there went on to work at EJLD PD, bringing along with them the Jefferson Parish Sheriff's Office's deeply rooted history and culture of racism.

51.    EJLD PD's supervisory body, the Southeast Louisiana Flood Protection Authority-East ("SLFPAE"), has also previously failed to properly address internal complaints of discrimination and, as a result, came under investigation by state auditors.[23]  An April 2022 survey

---

[18] *Id.*

[19] Adam Nossiter, *Harry Lee, Outspoken Louisiana Sheriff, Dies at 75,* The New York Times, Oct. 2, 2007, https://www.nytimes.com/2007/10/02/us/02lee.html.

[20] *Id.*

[21] John Burnett, *Larger-Than-Life Sheriff Rules Louisiana Parish*, NPR, Nov. 28, 2006, https://www.npr.org/templates/story/story.php?storyId=6549329.

[22] John Simerman, Michelle Hunter & Ramon Antonio Vargas, *Jefferson Parish Sheriff's Office an Outlier on Body Cams as Criticism Swirls Around Deadly Force,* The New Orleans Advocate, Jun. 27, 2020, https://www.nola.com/news/crime_police/article_cb8b82da-b8a1-11ea-bfec-6bf1ae8b2595.html.

[23] Michael Finch II & David Hammer, *Louisiana Auditor Opens Sweeping Probe of Flood Authority,* The New Orleans Advocate, February 18, 2022, https://www.nola.com/news/politics/louisiana-auditor-opens-sweeping-probe-of-flood-authority/article_a9be4820-910a-11ec-ae52-cf84c173058f.html.

of SLFPAE employees found that 46 out of 150 respondents, about 30%, felt the agency did not follow its grievance policy and 58, or 38.7%, feared retaliation if they filed a grievance, according to the report.  The Louisiana Legislative Auditor ("LLA") noted that, despite policies prohibiting discrimination, 27.5% of those surveyed reportedly experienced or witnessed discrimination within the prior year.  "The most common types of discrimination reported at SLFPAE involved age (18 or 19.4%), race or ethnicity (17 or 18.3%), or sex (12 or 12.9%)," auditors wrote.  Auditors also found that the SLFPAE did not always follow civil service rules for disciplinary actions between 2018 and 2022.[24]  SLFPAE's inability to address discrimination within in its own ranks indicates an inability to respond to similar grievances about the police force it supervises.

52.    Based on data collected from 2013- 2021, a Black person was 8.2 times as likely to be killed by police than a White person in Jefferson Parish.[25]  Further, though Black people were only 26% of the population, they made up 71% of the people killed by the police.[26]

53.    In a lawsuit filed in 2019, a Brown-skinned, Palestinian-American parent of a high-schooler at a cross-country meet was unlawfully detained by EJLD PD for over 22 minutes, harassed, racially profiled, and discriminated against based on race and national origin at the hands EJLD PD officers.[27]  Officers screamed, "I don't know what country you come from, but this is not how we do things around here!" and "You might get arrested because I am sick of you people" at the cooperative and non-confrontational plaintiff.[28]

54.    The EJLD officers' behavior toward Mr. Asante-Chioke resulted from this same deep-rooted history of racially motivated misconduct and policing.

---

[24] Victor Skinner, *Audit Finds Numerous Personnel Issues with Flood Protection Authority,* Biz New Orleans, October 3, 2022, https://www.bizneworleans.com/audit-finds-numerous-personnel-issues-with-flood-protection-authority/.
[25] *Id.*
[26] *Id.*
[27] *Odeh v. Butler et. al.*, Case No. 2:19-cv-13212 (E.D. La. Oct. 21, 2019).
[28] Am. Compl. at 5, *Odeh v. Butler et. al.*, Case No. 2:19-cv-13212 (E.D. La. June 14, 2022), ECF No. 40.

*Louisiana State Police's History of Discrimination*

55.    LSP has a well-documented history of racism against Black people, which unsurprisingly leads to the discriminatory use of excessive force against them.[29]

56.    After a recent use-of-force investigation, one LSP trooper was arrested for aggravated battery stemming from an incident where he struck a man with his flashlight 18 times in 24 seconds.[30]  Four more troopers were arrested in connection with that same incident for alleged excessive force and turning off their body cameras.  These four men brutally beat a Black man and then bragged over text about the "whoopin,'" stating that the man was going to "be sore tomorrow for sure" and "have nightmares for a long time."  One trooper stated that the incident—their brutal beating of a Black man who had already surrendered— "warm[ed] [his] heart."[31]

57.    Then, in 2020, LSP made national news for killing Ronald Greene, another Black man who surrendered after a high-speed chase.[32]  Mr. Greene was repeatedly tased, punched, choked, and beaten by four LSP troopers until he was left facedown for several minutes and eventually died.  LSP then tried to cover up their violent misconduct, falsely telling Mr. Greene's family that Mr. Greene had died upon impact after crashing his vehicle into a tree—a complete fabrication designed to conceal LSP's horrific conduct.  More than a year passed before LSP finally opened an internal investigation into Mr. Greene's killing; it

---

[29] *See, e.g.,* Kirsten Weir, *Policing in black & white*, American Psychological Association, Dec. 2016, https://www.apa.org/monitor/2016/12/cover-policing.html (discussing how implicit and explicit racial biases impact police officers' decisions to utilize excessive force against people of color)

[30] Ashley Mott, *Louisiana trooper struck man 18 times in 24 seconds, concealed video: LSP warrant*, Monroe News-Star, Dec. 11, 2020, https://www.thenewsstar.com/story/news/crime/2020/12/11/lsp-trooper-hit-aaronbowman-18-times-concealed-video-warrant/3896936001/.

[31] Timothy Bella, *State troopers texted about the 'whoopin' they gave a Black man, records show: 'He's gonna have nightmares,'* The Washington Post, Mar. 13, 2021, https://www.washingtonpost.com/nation/2021/03/13/louisiana-police-black-man-text/.

[32] Dan Levin, Michael Levenson, McKenna Oxenden & Rick Rojas, *What We Know About Ronald Greene's Death*, NY TIMES (Dec 16, 2022), https://www.nytimes.com/article/ronald-greene-video-louisiana.html

took more than three years for law enforcement officers to be charged in connection with his death.[33]

58.    Further, numerous state and federal lawsuits against LSP demonstrate the police department's policy, practice, and custom of using excessive force against Black people.   The Superintendent and/or his deputies were sued:

   a.    After a man, who complied with the officer's order to exit the vehicle and put his hands behind his back during a traffic stop, was abruptly tased as he stood with his hands behind his back;[34]

   b.    After an officer tased a man while he was riding his bicycle down the street, causing him to fall off his bicycle.  As he laid defenseless on the ground, the officer kicked and stomped on the man's face, kneed his back, and dragged him across the pavement;[35]

   c.    After an officer repeatedly tased a man who was already in the back seat of a police car;[36]

   d.    After a handcuffed man was thrown to the ground face-down by an officer, causing his head to hit the floor with great force, resulting in intense pain, swelling and concussion-like symptoms;[37]

   e.    After peaceful protesters speaking against excessive force used on Black people were tear-gassed and shot at with unauthorized projectiles;[38]

---

[33] *Id.*
[34] *Betts v. Brennan*, No. CV 19-14680, 2021 WL 230242 (E.D. La. Jan. 22, 2021).
[35] *Terrell v. Pichon*, 413 F. Supp. 3d 515 (E.D. La. 2019), aff'd, 795 F. App'x 935 (5th Cir. 2020).
[36] *Thomas v. Louisiana State Police*, No. CV 18-10200, 2019 WL 2009245, at *1 (E.D. La. May 7, 2019).
[37] *Kokesh v. Curlee*, 422 F. Supp. 3d 1124 (E.D. La. 2019).
[38] *See* Complaint, *Williams v. Ferguson et. al.,* Case No. 2:21-cv-00852 (E.D. La. April 28, 2021).

f.  After a Black man was brutally beat while naked in a sheriff's office laundry room;[39]

g.  After a man was murdered by a firing squad of officers after he was already incapacitated and posed no threat;[40]

h.  After a Black man was pulled over and surrendered unconditionally, yet LSP Troopers brutally beat and suffocated him;[41]

i.  After a man, wrongfully handcuffed and illegally searched, was tackled, beaten, and tased without provocation;[42]

j.  After a man was followed, pulled over, and handcuffed without cause, then beaten so violently he was later declared disabled.[43]

59.    Dozens of current and former state troopers with the LSP have described "a culture of impunity, nepotism and in some cases, outright racism."[44]  In fact, 67% of LSP troopers' use of force targeted Black people in recent years, more than double the percentage of the Black population in Louisiana.[45]

60.    The above incidents show that Defendant Colonel Lamar A. Davis was on notice of the need not only to adequately train, supervise, and discipline his officers, but also to not subject Black people to discriminatory excessive force.

---

[39]*See* Complaint, *Brown v. Pouncy et. al.,* Case No. 5:21-cv-03415 (W.D. La. Sept. 24, 2021).

[40] *See* Complaint, *Nevarez v. Coleman et. al.,* Case No. 2:21-cv-01855-SSV-DMD (E.D. La. June 28, 2022).

[41] *See* Complaint, *Harris v. Brown, et al*., Case No. 3:21-cv-01332-TAD-KDM (W.D. La. May 19, 2021).

[42] *See* Complaint, *Stewart v. Loftlin et al*., Case No. 3:21-cv-03789-TAD-KDM (W.D. La. Dec. 21, 2021).

[43] *See* Complaint, *Monroe v. Conner et al*., Case No. 5:21-cv-04063-EEF-MLH (W.D. La. Dec. 3, 2021).

[44] Jim Mustian & Jake Bleiberg, *In Louisiana, a Father, a Son and a Culture of Police Abuse*, AP NEWS (Oct. 26, 2021), https://apnews.com/article/business-louisiana-race-and-ethnicity-racial-injustice-baton-rouged2d50979a247c400746ba6703225f7ff.

[45] *Id.*

*Institutional Failures*

61.    LSP and EJLD are known and frequently sued for alleged violations of the Fourth Amendment for unreasonable searches and seizures, and excessive force, including deadly force.

62.    LSP, the agency responsible for conducting internal investigations on police excessive force incidents, is itself under a federal "pattern and practice" investigation for both police brutality and potential cover-ups, including LSP's proclivity for deflecting blame and impugning victims.  A recent Associated Press investigation has revealed that LSP has an extensive history of rubberstamping its investigations.  According to a recent Associated Press report:

> When [excessive force] footage is recorded, the agency [LSP] routinely refuses to release it.  And a recently retired [LSP] supervisor who oversaw a particularly violent clique of troopers told internal investigators this year that it was his "common practice" to rubber-stamp officers' use-of-force reports without reviewing body-camera video.[46]

63.    None of the body camera footage obtained to date demonstrates that the Officer Defendants were legally justified in shooting and killing Mr. Asante-Chioke.  Instead, it demonstrates that this violent outcome could have been entirely avoided with even a modicum of professional competence or compassion, and that the actions of the Officer Defendants were completely negligent.

64.    The failure of the Officer Defendants to utilize any de-escalation tactics or approach Mr. Asante-Chioke in a manner consistent with handling of persons with mental illness clearly demonstrates that the Officer Defendants did not receive proper training on de-escalation tactics and the proper use of force in situations regarding persons with severe mental illnesses, and as

---

[46] Jim Mustian and Jake Bleiberg, *Beatings, buried videos a pattern at Louisiana State Police*, https://apnews.com/article/police-beatings-louisiana-video-91168d2848b10df739d73cc35b0c02f8 (last visited Apr. 17, 2023).  *See also* Associated Press & Jim Mustian, *Louisiana state police undergo review after string of beatings of Black motorists*, https://www.wwltv.com/article/news/crime/la-state-police-undergo-outside-review/289-d40aaa9c-91a3-49e2-8f3a-3cb2c7883dcb (last visited Apr. 17, 2023) ("The Louisiana State Police have hired an outside consultant to conduct a top-to-bottom review of the scandal-plagued agency….").

such were negligent in the exercise of their duties.[47]  As law enforcement agents often encounter and interact with persons suffering from mental illness, training on how to interact with persons suffering from severe mental illness is critical.  Nearly one in four of all fatal police shootings involve a person suffering from a severe mental illness.[48]

65.    As such, the risk of being killed during a police incident is 16 times greater for individuals with untreated mental illness than for other civilians approached or stopped by officers.[49]  Where official government data regarding police shootings and mental illness have been analyzed – in one U.S. city and several other Western countries – the findings indicate that mental health disorders are a factor in as many as 1 in 2 fatal law enforcement encounters.[50]

66.    The Supervisor Defendants either know or should have reasonably known that persons with severe mental illness are vastly overrepresented in fatal police encounters.

67.    The Supervisor Defendants, as the chief policy makers of LSP and EJLD, are responsible for setting the training and oversight standards of the officers under their supervision.

68.    The Supervisor Defendants are responsible for failing to institute adequate training and policies regarding the handling of persons with severe mental illness, and how to de-escalate those encounters without resorting to deadly force.

69.    Upon information and belief, no de-escalation tactics were used by the Officer Defendants before they killed Mr. Asante-Chioke.  The video evidence obtained from witnesses

---

[47] *See Sanchez v. Gomez*, 382 F. Supp. 3d 524, 547 (W.D. Tex. 2017) ("If officers are given the authority to use deadly
force when they fear for their safety, they must be given the tools to adequately discern when they are in danger and how to minimize and reduce that danger when interacting with an individual suffering from mental health issues.").
[48] Treatment Advocacy Center, *Overlooked and Undercounted: The Role of Mental Illness in Fatal Law Enforcement Encounters*, https://www.treatmentadvocacycenter.org/storage/documents/overlooked-in-the-undercounted.pdf (last visited Apr. 17, 2023).
[49] Kesic, D. (2013).  The role of mental disorders in use of force incidents between the police and the public.  In D. Chappell (Ed.), Policing and the mentally ill: International perspectives (pp. 153-170).  Boca Raton, FL: CRC Press.
[50] Clifford, K. (2013).  Mental health crisis and interventions and the politics of police use of deadly force.  In D. Chappell (Ed.), Policing and the mentally ill: International perspectives (pp. 171-195).  Boca Raton, FL: CRC Press.

on the scene shows that the Officer Defendants could have, but did not, employ alternatives to the use of force.

70.    Indeed, instead of de-escalating the situation, the Officer Defendants acted in a manner to escalate Mr. Asante-Chioke's mental health crisis.  Upon their arrival at the scene, the Officer Defendants never attempted to speak to Mr. Asante-Chioke in a calm manner or use open-hand techniques de-escalate the situation.  Nor did the Officer Defendants, upon information and belief, ever attempt to implement non-lethal force.  In fact, although a spokesperson for LSP stated publicly that the officer who initially shot at Mr. Asante-Chioke attempted to tase him, later autopsy results showed no indication of any taser use.

71.    Instead, the Officer Defendants arrived at the scene with guns drawn, screaming expletives at Mr. Asante-Chioke and threatening to kill him.  At one point Mr. Asante-Chioke slowed from a run to a walk.  The Officer Defendants could have taken this opportunity to initiate de-escalation tactics, but instead continued to approach Mr. Asante-Chioke with their guns drawn, screaming at him.

72.    Had the Supervisor Defendants competently instituted these policies and training, or, in the alternative, enforced the policies and training already nominally required, Mr. Asante-Chioke would still be alive.  Had the Supervisor Defendants properly supervised their subordinates, Mr. Asante-Chioke would still be alive.

## CAUSES OF ACTION

### Count I – 42 U.S.C. § 1983 Excessive Force
### (Against Officer Defendants Dowdle, Downing, Duplessis, and Does)

73.    Plaintiff hereby incorporates by reference the preceding paragraphs as though fully set forth herein.

74.     The Fourth Amendment of the U.S. Constitution guarantees a clearly established right to be free from excessive force at the hands of the police.

75.     Officer Defendants deprived Mr. Asante-Chioke of clearly established rights guaranteed to him under the United States Constitution.

76.     With no legal cause, the Officer Defendants used repeated, excessive, and deadly force against Mr. Asante-Chioke, a person of color experiencing a mental health crisis, by shooting him multiple times even after he was disarmed and incapacitated.

77.     Officer Defendants' use of repeated, excessive, and deadly force against Mr. Asante-Chioke was the direct and proximate cause of Mr. Asante-Chioke's injuries and death.

78.     As stated above, a subsequent investigation conducted by Louisiana State Police determined that a total of thirty-six rounds were fired by Defendants Dowdle, Downing, and Duplessis at Mr. Asante-Chioke, and an autopsy showed that twenty-four of those rounds shot Mr. Asante-Chioke.

79.     A use of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased.  Each of the shots that struck Mr. Asante-Chioke after he was incapacitated represents a separate, legally distinct exercise of excessive and deadly force, each of which alone was capable of fully incapacitating (or killing) Mr. Asante-Chioke.

80.     It is clearly established law that after an individual has been incapacitated a law enforcement officer may not continue to use deadly force.  The Fifth Circuit has recently affirmed this in its ruling in *Roque v. Harvel*, 993 F.3d 325 (5th Cir. 2021), a case that also involved the deadly officer shooting of a person of color in mental health crisis, by denying the police officers qualified immunity on this basis.

81.    Any reasonable officer in these circumstances would have recognized that the excessive and violent force applied to Mr. Asante-Chioke while he was incapacitated was utterly unjustified, unnecessary, excessive, and unreasonable.

82.    The Officer Defendants, who were acting under the color of state law, and acting with deliberate indifference, deprived Mr. Asante-Chioke of the rights, privileges, and immunities afforded to him under the Constitution and laws of the United States, including those under the Fourth and Fourteenth to the Constitution.

83.    The actions of the Officer Defendants reflect their reckless disregard for Mr. Asante-Chioke's constitutional rights and his humanity; and the willful, cruel, and unconscionable actions of the Officer Defendants warrant both compensatory and punitive damages for the incredible suffering caused to Plaintiff as a result of the completely unnecessary death of her father.

### Count III – Wrongful Death
### (Against Officer Defendants Dowdle, Downing, Duplessis, and Does)

84.    Plaintiff hereby incorporates by reference the preceding paragraphs as though fully set forth herein.

85.    The Officer Defendants are liable jointly, severally, and *in solido* for wrongfully causing Mr. Asante-Chioke's death.  They each used unjustifiable deadly force against him multiple times with deliberate indifference to his constitutional rights and humanity, including their callous disregard for his medical needs for every shot after he was incapacitated.

86.    The actions of the Officer Defendants were the proximate cause of the damages suffered by Mr. Asante-Chioke and Plaintiff, Ms. Malikah Asante-Chioke.  The repeated uses of excessive and deadly force by the Officer Defendants proximately caused Mr. Asante-Chioke to be physically injured to the point of death and experience conscious pain and suffering, and severe emotional distress before he died.

87.    Plaintiff, the daughter of Mr. Asante-Chioke, is entitled to recover for Mr. Asante-Chioke's wrongful death, including general damages and other compensable injuries.  These damages and compensable injuries include pecuniary losses such as funeral and burial expenses. Plaintiff has also suffered damages in the form of loss of love, affection, and support from her father, with whom she was exceptionally close.    Additionally, the willful, cruel, and unconscionable actions of the Officer Defendants warrant punitive damages for the incredible suffering caused to Plaintiff.

### Count IV – Survival Action
### (Against Officer Defendants Dowdle, Downing, Duplessis, and Does)

88.    Plaintiff hereby incorporates by reference the preceding paragraphs as though fully set forth herein.

89.    Plaintiff, as Mr. Asante-Chioke's surviving child, has standing to bring this claim under to La. C.C. Art. 2315.1 A(1) ("If a person who has been injured by an offense or quasi offense dies, the right to recover all damages for injury to that person, his property or otherwise, caused by the offense or quasi offense, shall survive for a period of one year from the death of the deceased in favor of:  The surviving spouse and child or children of the deceased, or either the spouse or the child or children.").

90.    The Officer Defendants, who were acting under the color of state law, deprived Mr. Asante-Chioke of the rights, privileges, and immunities afforded to him under the Constitution and laws of the United States by subjecting him to unreasonable and repeated excessive and deadly force.

91.    As explained above, the Officer Defendants' conduct ultimately caused Mr. Asante-Chioke's death.  These Officer Defendants not only lacked any regard for Mr. Asante-Chioke's humanity, but they also acted in callous disregard and with deliberate indifference to the

rights afforded to him under the Constitution, including to be free from excessive and deadly force. Their wrongful acts and omissions not only caused Mr. Asante-Chioke's wrongful death, but were willful, oppressive, malicious, and shocking to ordinary citizens' conscience, all of which warrant an award of punitive damages against each of the Officer Defendants.

92.    Plaintiff has suffered, and continues to suffer, damages as result of the wrongful death of her father, including pain and suffering, grief, loss of enjoyment of life, severe emotional distress, loss of support, and other similar damages.

## Count V – Battery
### (Against Officer Defendants Dowdle, Downing, Duplessis, and Does)

93.    Plaintiff hereby incorporates by reference the preceding paragraphs as though fully set forth herein.

94.    Plaintiff, as Mr. Asante-Chioke's surviving child, has standing to bring this claim under to La. C.C. Art. 2315.1 A(1) ("If a person who has been injured by an offense or quasi offense dies, the right to recover all damages for injury to that person, his property or otherwise, caused by the offense or quasi offense, shall survive for a period of one year from the death of the deceased in favor of:  The surviving spouse and child or children of the deceased, or either the spouse or the child or children.").

95.    The Officer Defendants battered Mr. Asante-Chioke, causing his death.  As explained above, the Officer Defendants intentionally and without Mr. Asante-Chioke's consent used harmful and offensive conduct against him when they unlawfully shot him shot him twenty-four times.  Each of these uses of force beyond that needed to subdue him constitute a battery on Mr. Asante-Chioke by the Officer Defendants.

96.    In doing so, the Officer Defendants injured Mr. Asante-Chioke and Plaintiff, who is therefore entitled to general and compensatory damages.

## Count VI – Negligence
### (Against Officer Defendants Dowdle, Downing, Duplessis, and Does)

97.    Plaintiff hereby incorporates by reference the preceding paragraphs as though fully set forth herein.

98.    Plaintiff seeks relief pursuant to La. C. C. Art. 2315.  The Officer Defendants were negligent in their duties as law enforcement officers and in their training insofar as they clearly failed to adhere to proper training standards that clearly dictate that uses of force are to cease when a suspect has ceased all resistance.  In this case, the Officer Defendants continued to shoot Mr. Asante-Chioke even after he was disarmed and incapacitated, thus acting with extreme negligence in the exercise of their lawful duties to protect and serve the public.

99.    In doing so, the Officer Defendants injured Mr. Asante-Chioke and Plaintiff, who is therefore entitled to general and compensatory damages.

## Count VII – Negligent Supervision & Training
### (Against Supervisor Defendants Davis and Durnin)

100.    Plaintiff hereby incorporates by reference the preceding paragraphs as though fully set forth herein.

101.    Over the past several decades, it has become public knowledge that LSP's training of its officers is deeply racist, "discriminatory," and "repugnant."[51]  Public letters and media reporting have detailed how LSP's racist training "allowed a culture of racist policing to deeply root itself in the department."[52]

---

[51] *See* Aug. 27, 2021 ACLU-LA Letter at 2 n.3 (citing *United States v. Thomas*, 787 F. Supp. 663, 676 (E.D. Tex. 1992); *see also* Randall Susskind, *Race, Reasonable Articulable Suspicion, and Seizure*, 31 Am. Crim. L. Rev. 327, 335 (1994) (using LSP's training film as an example of how racism undercuts the notion of reasonable articulable suspicion); David Cole, *No Equal Justice: Race and Class in the American System* 41 (1999) (discussing the same video)).

[52] *Id.* at 2-3 (describing various incidents in which LSP officers exhibited racist behavior and used racist language).

102.    The severe misconduct exhibited by LSP—and the resulting harms that disproportionately affect people of color—reflects and is exacerbated by the deficient training its officers receive.[53]

103.    As relevant here, on knowledge and belief, the LSP fails to properly train officers on de-escalation tactics and on how to approach incidents involving individuals suffering from mental health issues.[54]  Such tactics may include:

> (i) whether and how, if there are no mental health experts available to negotiate the situation, to approach individuals experiencing mental health crises; (ii) the difference between, and relative merit of, verbal and non-verbal communication; and (iii) how to select an appropriate response in potentially violent situations.[55]

104.    Moreover, LSP has failed to supervise and discipline its officers for their excessive and often deadly uses of force, so much so that a "pattern of violence" and secrecy has developed within LSP, which has led to a significant amount of cases over the past decade in which LSP officers used excessive force—and covered up that use.[56]

105.    Supervisor Defendant Davis has since acknowledged that LSP has "deficiencies" and that he supports the hiring of an outside consultant to conduct an "overall assessment" of LSP's "culture and policies on use of force, hiring and training," in addition to the U.S. Department of Justice's pattern-and-practice investigation, "to help restore public trust following a string of high-profile beatings of Black motorists" that occurred over the past decade.[57]  Supervisor Defendant

---

[53] *Id.* at 8-9; *see also id.* at 9 & n.59 (noting that "nearly one in five people shot and killed by police are mentally ill, and these people are disproportionately Black").
[54] *Id.*
[55] *Id.* at 9 & n.57 (citing Robin S. Engal, et al., The Deafening Demand for De-Escalation Training: A Systematic Review and Call for Evidence in Police Use of Force Reform 6-7 (2020), https://www.theiacp.org/sites/default/files/IACP_UC_De-escalation%20Systematic%20Review.pdf.
[56] Mustian et al., *Beatings, buried videos*, *supra* note 2; *see also* Aug. 27, 2021 ACLU-LA Letter at 10-11 (detailing two examples of LSP's use of deadly force resulting from their inadequate training).
[57] Jim Mustian, *Louisiana State Police Undergo Review After String of Beatings of Black Motorists*, AP (Mar. 14, 2022), https://www.wwltv.com/article/news/crime/la-state-police-undergo-outside-review/289-d40aaa9c-91a3-49e2-8f3a-3cb2c7883dcb.

Davis stated that such an assessment "is a need of our agency [LSP]," and that "[w]hat I can't do is wait — and continue to wait — knowing that I have deficiencies."[58]

106.    EJLD has similarly failed to supervise and adequately train its officers.  SLFPAE, who supervises the EJLD PD, has failed to properly address internal complaints of discrimination and has failed to follow civil service rules for disciplinary actions.  *See supra ¶ 53.* With SLFPAE's poor supervision, paired with officers from the Jefferson Parish Sheriff's Office—a department with a history of prolific racial discrimination—moving on to serve under the EJLD, and the EJLD's inherently anti-Black policing tactics, the EJLD exhibits not only poor supervision, but poor training of its officers.[59]

107.    Accordingly, the Supervisor Defendants knew or should have known that the officers under their supervision were routinely receiving insufficient training and insufficient supervision regarding de-escalation tactics employed in incidents with citizens with mental illness, and that such poor and often racist training and lack of supervision was leading to unnecessary, negligent, and deadly uses of force.[60]

108.    The above-described widespread lack of proper supervision and training were allowed to exist because the Supervisor Defendants, who are policymakers with authority over their acts, exhibited deliberate indifference to the problem, thereby effectively ratifying it and enabling its perpetuation.  This failure to act was negligent under Louisiana law, and Plaintiff herein seeks relief under La. C.C. Art. 2315.

---

[58] *Id.*

[59] *See supra ¶¶* 45-55.

[60] "[P]olice are more likely to shoot and kill Black men who show signs of mental illness than white men displaying similar behaviors."  Aug. 27, 2021 ACLU-LA Letter at 10-11 (citing Minyvonne Burke, *Policing Mental Health: Recent Deaths Highlight Concerns Over Officer Response*, NBC News (May 16, 2021), https://www.nbcnews.com/news/us-news/policing-mental-health-recent-deaths-highlight-concerns-over-officer-response-n1266935.

109.    As such, the Supervisor Defendants injured Mr. Asante-Chioke and Plaintiff, who is therefore entitled to general and compensatory damages.

110.    Plaintiff further expressly requests trial by jury.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that after due proceedings, this Honorable Court enter judgment on her behalf and against all Defendants, jointly, severally, and *in solido*, as follows:

1.    Compensatory damages, including funeral and burial costs for Mr. Jabari Asante-Chioke;

2.    Reasonable attorneys' fees and costs;

3.    Punitive damages; and

4.    All other relief that this Court deems just and proper.

/s/ *E. Bridget Wheeler*
Erin Bridget Wheeler
**ACLU FOUNDATION OF LOUISIANA**
LA. Bar No. 37546
Nora Ahmed (*pro hac vice*)
New York Bar No. 5092374
1340 Poydras St., Ste. 2160
New Orleans, LA 70112
Tel: (504) 522-0628
bwheeler@laaclu.org
nahmed@laaclu.org

Dana Foster (*pro hac vice*)
DC Bar No. 489007
Alison Perry (*pro hac vice*)
DC Bar No. 1719791
Soraya Todd (*pro hac vice*)
DC Bar No. 1179456
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
Telephone: + 1 202 626 3600

Facsimile: + 1 202 639 9355
defoster@whitecase.com
alison.perry@whitecase.com
soraya.todd@whitecase.com

Erika Murdoch (*pro hac vice*)
NY Bar No. 5822242
Aabir Das (*pro hac vice*)
NY Bar No. 6043913
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10036-2787
Telephone: +1 212 819 8200
erika.murdoch@whitecase.com
pablo.das@whitecase.com

*Counsel for Plaintiff Malikah Asante-Chioke*