UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MALIKAH ASANTE-CHIOKE                           CIVIL ACTION

VERSUS                                          NO. 22-4587

NICHOLAS DOWDLE ET AL.                          SECTION: "J"(3)

## ORDER & REASONS

Before the Court is a *Motion to Exclude the Testimony of Thomas Martin* **(Rec. Doc. 205)** filed by Plaintiff Malikah Asante-Chioke. Defendants Officers Jonathon Downing, Gerard Duplessis, and Terry Durnin ("EJLD Defendants") filed an opposition to the motion. (Rec. Doc. 213). Defendants Col. Lamar A. Davis and Nicholas Dowdle ("LSP Defendants") also filed an opposition. (Rec. Doc. 218). Plaintiff filed a reply. (Rec. Doc. 232). Having considered the motion, the legal memoranda, the record, and the applicable law, the Court finds that the motion should be **GRANTED in part** and **DENIED in part**.

## LEGAL STANDARD

Federal Rule of Evidence 702 provides that a witness who is qualified as an expert may testify if: (1) the expert's "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (2) the expert's testimony "is based on sufficient facts or data"; (3) the expert's testimony "is the product of reliable principles and methods"; and (4) the principles and methods employed by the expert have been reliably applied to the facts of the case. Fed. R. Evid. 702. The United States Supreme Court's decision in *Daubert*

1

*v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), provides the analytical framework for determining whether expert testimony is admissible under Rule 702.

Both scientific and nonscientific expert testimony are subject to the *Daubert* framework, which requires trial courts to make a preliminary assessment of "whether the expert testimony is both reliable and relevant." *Burleson v. Tex. Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

When expert testimony is challenged under *Daubert*, the party offering the expert's testimony bears the burden of proving its reliability and relevance by a preponderance of the evidence. *Moore v. Ashland Chem. Co.*, 151 F.3d 269, 276 (5th Cir. 1998).

To be reliable, expert testimony must be based on "scientific knowledge," meaning it must be "ground[ed] in the methods and procedures of science" and based on "more than subjective belief or unsupported speculation." *Daubert,* 509 U.S. at 589-90. However, this rule does not require the testimony to be based on a scientific study, but allows testimony based on "personal experience" if, in the trial court's view, there is a sufficient level of "intellectual rigor" underlying the testimony. *Kumho Tire Co.*, 526 U.S. at 152. Indeed, "reliance upon extensive personal experience or specialized knowledge is an acceptable ground for the admission of expert testimony." *Derouen v. Hercules Liftboat Co., LLC*, No. CV 13-4805, 2015 WL 13528499, at *3 (E.D. La. Sept. 4, 2015).

2

A number of nonexclusive factors may be relevant to the reliability analysis, including: (1) whether the technique at issue has been tested; (2) whether the technique has been subjected to peer review and publication; (3) the potential error rate; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique is generally accepted in the relevant scientific community. *Burleson*, 393 F.3d at 584. The reliability inquiry must remain flexible, however, as "not every *Daubert* factor will be applicable in every situation; and a court has discretion to consider other factors it deems relevant." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004); *see also Runnels v. Tex. Children's Hosp. Select Plan*, 167 F. App'x 377, 381 (5th Cir. 2006) ("[A] trial judge has considerable leeway in determining how to test an expert's reliability.").

With respect to the relevancy prong, the proposed expert testimony must be relevant "not simply in the way all testimony must be relevant [pursuant to Rule 402], but also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue." *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003). Ultimately, a court should not allow its "gatekeeper" role to supersede the traditional adversary system, or the jury's place within that system. *Scordill v. Louisville Ladder Grp., LLC*, No. 02-2565, 2003 WL 22427981 at *3 (E.D. La. Oct. 24, 2003). As the Supreme Court noted, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Generally, questions relating to the basis and

sources of an expert's opinion rather than its admissibility should be left for the jury's consideration. *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996) (citing *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987)).

## PARTIES' ARGUMENTS AND DISCUSSION

In his report, Mr. Martin offers the following conclusions and opinions:

1. There is a difference between what an officer can actually see during a real time event and what is captured on the officer's body worn camera recording.
2. Each officer had a different visual perspective of Mr. Asante-Chioke as they fired at him.
3. It is not possible to identify the gun that fired bullet #15 using trajectory analysis, nor is it possible to determine exactly where in the sequence of the thirty-six shots that bullet #15 was fired.
4. Mr. Asante-Chioke's position of bending forward as he was falling forward is consistent with the back to front and upward trajectory of gunshot wound #15.
5. Given the wound path of bullet #15, and the position of Trooper Dowdle at the 3.67 frame . . . the trajectory of bullet #15 is not consistent with have [sic] been fired by Tpr. Dowdle at this frame.
6. The origination point (firearm) and sequence of each shot can not be determined with any scientific certainty using trajectory analysis. (Rec. Doc. 205-7, at 35).

Plaintiff urges the Court to exclude Mr. Martin's first two conclusions because they are factual statements that are unhelpful to the factfinder. (Rec. Doc. 205-1, at 5). Plaintiff then argues that the rest of Mr. Martin's opinions are inadmissible because (1) Mr. Martin is unqualified, (2) his opinions lack factual support, (3) his methodology is unreliable, and (4) his opinions are unhelpful to the factfinder. *Id.*

4

I.  **Mr. Martin's First Two Conclusions**

Plaintiff seeks to exclude the first two conclusions and opinions from Mr. Martin's report where he states, "There is a difference between what an officer can actually see during a real time event and what is captured on the officer's body worn camera recording." (Rec. Doc. 205-1, at 3). And "[e]ach officer had a different visual perspective of Mr. Asante-Chioke as they fired at him." *Id.* Plaintiff argues that such conclusions and opinions will not assist the factfinder. *Id.* at 3,5. LSP Defendants do not contest Plaintiff's argument.

The Court agrees with Plaintiff. Expert testimony will not assist the factfinder if it "provide[s] information that is a matter of common knowledge." *United States v. McGinnis*, 201 F. App'x 246, 248 (5th Cir. 2006). It is common knowledge that what an officer can see during an event is different from what an officer's body cam footage captures. It is also common knowledge that each shooting officer had their own visual perspective of Mr. Asante-Chioke during the shooting. Accordingly, the Court will exclude these opinions.

II.  **Mr. Martin's Trajectory Analysis**

Plaintiff next seeks to exclude Mr. Martin's trajectory analysis and any opinions derived therefrom. (Rec. Doc. 205-1, at 5). Plaintiff argues that Mr. Martin's trajectory analysis should be excluded because (1) he is unqualified, (2) his opinions lack factual support, and (3) his methodology is unreliable. *Id.* at 7–15.

Plaintiff argues that Mr. Martin is unqualified to conduct a shooting reconstruction because he lacks specialized training in bullet trajectory analysis. *Id.*

5

at 7–8. Plaintiff also asserts that Mr. Martin is unqualified to review the video evidence to reconstruct the scene because he lacks specialized training in video analysis. *Id.* at 8.

LSP Defendants argue that Mr. Martin has the requisite specialized training in shooting reconstruction to testify here (Rec. Doc. 218, at 7–9), and the Court agrees. Mr. Martin testified that he practiced shooting reconstructions regularly during his 22-year career with the New York State Police. (Rec. Doc. 218-1, at 14). Mr. Martin also testified that he continues practicing shooting reconstruction, and to stay up to date in the field, he attends conferences, reads newsletters and periodicals, goes to the shooting range and runs test fires, and is "actively involved in [shooting reconstructions] on a day-to-day basis." *Id.* at 14–15. Mr. Martin claims to have participated in approximately 1,000 autopsies concerning shootings where he took pictures, retrieved bullets, and assisted in tracking bullets through the body. *Id.* at 41–42. Mr. Martin further claims that he is "Force Science" certified, which he explains involves training in human factors, including the anatomy and physiology of shootings. *Id.* at 15.

Plaintiff fails to offer any case where Mr. Martin was deemed unqualified to opine on shooting scene reconstruction. Further, at least two courts have recognized Mr. Martin's expertise in the relevant subject matter. In *Marks v. Bauer*, The United States District Court for the District of Minnesota explained that "Martin is a shooting reconstructionist with over 30 years of training and experience." 2023 WL 1478015, No. 20-cv-1913, at *16 (D. Mn. Feb. 2, 2023). The United States District

Court for the District of Colorado also recognized Martin's qualifications. "Martin is a crime scene reconstruction expert. The Court need not delve into his credentials, and the Court has no doubt of Mr. Martin's expertise in these matters." *Valdez v. Motyka*, No. 15-cv-0109, 2019 WL 4686605, at *6 (D. Colo. Sept. 26, 2019) (excluding Mr. Martin for reasons independent of his expertise). Plaintiff offers no authority which requires a shooting reconstruction expert to have specialized training in either video analysis or bullet trajectory analysis. Accordingly, the Court finds Mr. Martin qualified to opine here.

### A. *Evidentiary Support*

Plaintiff argues that Mr. Martin's trajectory analysis is unsupported by the evidence in the record. (Rec. Doc. 205-1, at 8–11). Specifically, Plaintiff argues that no evidence supports Mr. Martin's opinion that the "wound path of bullet #15 could be consistent with any" of Mr. Asante-Chioke's body positions at 1.13, 1.23, or 1.27 seconds after the start of the shooting. *Id.* at 9. Stills from Mr. Martin's report taken during each of these times show that Mr. Asante-Chioke was parallel to a concrete wall to his left and fell forward as he was being fired upon. (Rec. Doc. 205-7, at 27, 28, 29). Plaintiff argues that no evidence supports this opinion because the wound path of bullet #15 had a left-to-right path through Mr. Asante-Chioke's body, but the shooting officers were positioned to Mr. Asante-Chioke's right as they fired upon him during that time. (Rec. Doc. 205-1, at 9–10).

LSP Defendants argue that evidence in the record does support Mr. Martin's opinion because stills in his report show some leftward rotation of Mr. Asante-Chioke

7

as he fell, which could have altered a bullet's trajectory as it traveled through his body. (Rec. Doc. 218, at 10). LSP Defendants also point out that the exact locations of each shooting officer are unknown, and that images in the report show that Officer Duplessis was positioned farther to the left than the other shooting officers such that he could have fired a shot which produced a left-to-right wound path. *Id.*

This Court agrees with LSP Defendants. In his report, Mr. Martin provides that "[a] small twist of the body . . . as each bullet is fired . . . can alter the direction of the bullet through the anatomy." (Rec. Doc. 205-7, at 32). Stills in Mr. Martin's report show that Mr. Asante-Chioke rotated slightly to the left as he fell. (Rec. Doc. 205-7, at 27, 28, 29). Further, the exact locations of the shooting officers are unknown, and stills in the report show that Officer Duplessis was nearly directly behind Mr. Asante-Chioke as the last shot was fired. *Id.* at 14. Thus, the Court is unwilling to say that no evidence supports Mr. Martin's opinion. To the extent that Plaintiff disagrees with Mr. Martin's opinions, she is free to challenge them at trial. As the United States Supreme Court has explained, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharmaceuticals*, Inc. 509 U.S. 579, 596 (1993). Accordingly, the Court will not exclude Mr. Martin's testimony based on this challenge.

8

*B. Reliability*

Plaintiff next argues that Mr. Martin uses unreliable principles and methods to create the shooting reconstruction. (Rec. Doc. 205-1, at 11). Specifically, Plaintiff argues that Mr. Martin did not use a reliable methodology to determine the positions and angles of the shooting officers relative to Mr. Asante-Chioke when he opines that "(1) the bullet that caused Wound #15 could have been fired at 1.13, 1.23, and 1.27 seconds, and (2) the trajectory of Wound #15 is not consistent with Shooting Defendant Dowdle's position at 3.67 seconds." *Id.* at 12. For similar reasons, Plaintiff also seeks to exclude Mr. Martin's diagram on page 31 of his report, where he depicts the entry and termination point of Wound #15 on Mr. Asante Chioke 3.67 seconds into the shooting. (Rec. Doc. 205-1, at 14). Plaintiff contends that Mr. Martin's methodology is unreliable because he did not calculate the shooting angles of the officers nor provide the potential error rate of his method for determining the shooting officers' locations. *Id.* at 12. Plaintiff suggests that Mr. Martin merely guessed the shooting angles, the officers' locations, and the entry and exit points on the diagram. *Id.* at 15.

LSP Defendants argue that Mr. Martin did not calculate the shooting angles or the precise positions of the shooting officers because such information "cannot be determined with any scientific certainty due to the multifactorial aspect of this shooting, including the number of shooters, lack of specific location of two of the shooters, and the dynamic and continued movement of the shooters and Chioke." (Rec. Doc. 218, at 9). Still, LSP Defendants contend that Mr. Martin did not merely

9

guess the relevant information and that his opinions are "reliably based on his review of the video, wound paths, and positioning" of the shooting officers. *Id.* at 11.

The Court agrees with LSP Defendants. Mr. Martin, a shooting scene reconstruction expert, conducted a bullet trajectory analysis by reviewing Dr. Dana Troxclair's autopsy report to determine the path of Wound #15. (Rec. Doc. 205-7, at 24–25). Mr. Martin analyzed that wound path and used a commercially available computer program to illustrate it on a computer-generated skeleton in the anatomical position. *Id.* at 25–26. Mr. Martin then superimposed that wound path onto three body-worn camera images of Mr. Asante-Chioke during the first 1.13, 1.23, and 1.27 seconds of the shooting. *Id.* at 27–29. Mr. Martin relied on video evidence, an orthophoto, geometrical calculations, and landmarks to determine the general area of the shooting and approximate the location of the officers at the start of the shooting. (Rec. Doc. 205-7, at 16; Rec. Doc. 218-1, at 171).

Mr. Martin then conducted a similar analysis to depict the entry and terminal locations of Wound #15 on Mr. Asante-Chioke 3.67 seconds after the start of the shooting. (Rec. Doc. 205-7, at 31). Plaintiff presents no authority which requires a shooting scene reconstruction expert to calculate the shooting angles of the officers nor provide an error rate for determining the shooting officers' locations. Accordingly, the Court will not exclude Mr. Martin's opinions for lack of a reliable methodology, nor will it exclude the diagram on page 31 of his report.

### III. Human Perception-Reaction Time

Next, Plaintiff seeks to exclude Mr. Martin's opinions on perception-reaction time by arguing that (1) Mr. Martin is unqualified to render such opinions; (2) such opinions are unhelpful to the factfinder; and (3) he bases his opinions on inapplicable and unreliable studies. (Rec. Doc. 205-1, at 16).

*A. Qualifications*

Plaintiff argues that Mr. Martin is unqualified to opine on human perception-reaction time because he "lacks any recent training on human perception." (Rec. Doc. 205-1, at 16). EJLD Defendants argue that Mr. Martin does have recent training on human perception-reaction time, and all Defendants note his certifications and years of experience in the field. (Rec. Doc. 213, at 15; Rec. Doc. 218, at 14).

The Court agrees with Defendants. Plaintiff offers no authority which requires an expert to have recent training on human perception-reaction time. Mr. Martin testified that he took a "Force Science" course as recently as 2021, in which he received a certification covering multiple areas, including perception-reaction times. (Rec. Doc. 218-1, at 15–16). Mr. Martin also testified that he took classes on human response time and perception in college and during his career with the state police. *Id.* at 20. As Mr. Martin explained, he has "been learning and studying perception-reaction times for decades." *Id.* at 115. Accordingly, the Court finds Mr. Martin qualified to opine on perception-reaction time.

*B. Helpfulness*

Plaintiff next argues that Mr. Martin's opinion on perception-reaction time will not help the factfinder because they are common sense. (Rec. Doc. 205-1, at 17). The Court rejected a similar argument in its November 21, 2025 Order and Reasons and will do the same here. While a lay person may have a general understanding of perception-reaction times, "[a] lay person typically would not have experience or knowledge about the time it takes an officer to react to a perceived threat or the absence of a perceived threat." *Estate of Smart v. Chaffee*, No. 14-2111, 2020 WL 7643505, at *14 (D. Kan. Dec. 23, 2020). By opining that a shooting officer takes time to react to a stimulus to stop shooting, Mr. Martin may help the factfinder determine whether the Defendant Officers' actions were reasonable when they continued to shoot Mr. Asante-Chioke. Consequently, the Court will not exclude Mr. Martin's testimony as unhelpful.

*C. Reliability*

Plaintiff next argues that this Court should exclude Mr. Martin's opinions on perception-reaction time because they are based on unreliable scientific studies and "junk science." (Rec. Doc. 205-1, at 18). Defendants argue that Mr. Martin bases his opinions on his training and experience and expert studies. (Rec. Doc. 213, at 15; Rec. Doc. 218, at 14). However, Defendants do not discuss the scientific validity of these studies.

At the end of Mr. Martin's opinions on perception-reaction time he opines as follows:

> Studies have shown that when officers are guided by an audio signal (stimulus) to stop shooting, the final shot fired occurred an average of .261 seconds after the audio signal/stimulus was recognized by the officer. Most officers fired one or two shots after the end signal/stimulus was given.
>
> Studies have shown that when officers are guided by a visual signal (stimulus) to stop shooting the average time for an officer to recognize the signal/stimulus and stop pulling the trigger was between .35 seconds and .5 seconds. The more complex the scenario, the longer it takes for an officer to recognize the stimulus and stop pulling the trigger. (Rec. Doc. 205-7, at 33).

In connection with these opinions, Mr. Martin cites two sources: the first, an article entitled *Officer Reaction-Response Time Delay at the End of a Shot Series*; the second, an article entitled *Reaction Times in Lethal Force Encounters, Time to Start Shooting? Time to Stop Shooting?* (Rec. Doc. 205-7, at 33 nn. 1, 2). Both articles allegedly discuss studies which support Mr. Martin's opinions.

An expert's sources must be based on "scientific knowledge." *Wells v. SmithKline Beecham Corp.*, 601 F. 3d. 375, 379–81 (5th Cir. 2010). Defendants fail to address any of Plaintiff's arguments which question the scientific validity of Mr. Martin's sources. Specifically, Defendants do not argue that "these articles were peer reviewed, used control groups, reported statistically significant results, or are generalizable to the New Orleans police context." (Rec. Doc. 205-1, at 18). Therefore, the Court is unable to find that Mr. Martin's sources meet the reliability standards under Rule 702. *Brandner v. State Farm Mut. Ins. Co.*, No. 18-cv-982, 2019 WL 636423, at *6 (E.D. La. Feb. 14, 2019) (excluding experts because they did not document whether their referenced studies "were peer reviewed" or whether the results of the studies were "generally accepted by the scientific community").

13

Accordingly, the Court will exclude Mr. Martin's statements which rely on these two sources.

**IV. Human Vision and Body-Worn Cameras**

Plaintiff next seeks to exclude Mr. Martin's additional opinions on the difference between human vision and what is captured on a body-worn camera. (Rec. Doc. 205-1, at 19). Plaintiff argues that Mr. Martin cannot opine on this issue because he is unqualified, his opinions would not help the factfinder, and his opinions lack a reliable methodology. (Rec. Doc. 205-1, at 19–20).

*A. Qualifications*

Plaintiff argues that Mr. Martin is unqualified to opine on the difference between what is captured by human vision versus a body-worn camera because he lacks any specific training in video analysis. *Id.* at 19. Defendants argue that Mr. Martin does not need special training in video analysis and can instead rely on his years of experience and training as a police officer investigating crime scenes and shooting incidents. (Rec. Doc. 213, at 15; Rec. Doc. 218, at 15).

The Court agrees with Plaintiff. Defendants fail to explain how Mr. Martin's years of training and experience as an officer qualify him as an expert on the difference between human perception and what body cam footage captures. Mr. Martin lacks any special education in human vision or video field of view. Further, Mr. Martin retired from the police force in 2010 (Rec. Doc. 205-7, at 3), well before the implementation of body cam footage programs across the United States. Logan Seacrest & Jillian Snider, *The Past, Present, and Future of Police Body Cameras*, R

14

Street Inst. (July 1, 2025), https://www.rstreet.org/research/the-past-present-and-future-of-police-body-cameras/. Accordingly, the Court finds Mr. Martin unqualified to opine on the difference between human perception and body cam footage.

### IV. Officer Training and Focus

Plaintiff next seeks to exclude Mr. Martin's opinions concerning how officers are trained to focus when firing their weapons. (Rec. Doc. 205-1, at 20). Plaintiff argues that Mr. Martin is unqualified because he admittedly is not a police practices expert. *Id.* (citing (Rec. Doc. 205-5, at 12)). LSP Defendants argue that Mr. Martin is qualified to opine on these issues, again noting his experience as an officer and investigator of crime scenes and shooting incidents. (Rec. Doc. 218, at 15).

In his report, Mr. Martin opines as follows:

> Police are trained to focus on the front sight (or holographic red dot) of their pistol when firing. When using iron sights, the rear sight is used to orient the front sight, which is then placed over the intended target, or "center mass." The human eye can not focus on these three points (rear sight, front sight, target) simultaneously, so proper shooting technique requires the shooter to focus on the front sight, which causes the rear sight and the target to become out of focus, or to appear blurry. This concentrated focus on the front sight further restricts vision to a specific area and eliminates nearly all peripheral vision. (Rec. Doc. 205-7, at 33).

LSP Defendants fail to convince this Court that Mr. Martin is qualified to offer expert opinions on how officers are trained to shoot and how this training affects their field of vision. Mr. Martin is admittedly not an expert on police use of force policies and procedures. (Rec. Doc. 205-5, at 12). Further, Mr. Martin's opinion on what the human eye can focus on and perceive while shooting is beyond his education and experience. Accordingly, the Court will exclude such opinions.

## V. Threat Characterizations

Plaintiff next seeks to exclude Mr. Martin's characterization of Mr. Asante-Chioke as a "threat" or "imminent threat." (Rec. Doc. 205-1, at 21). Plaintiff argues that such characterizations are impermissible legal conclusions. *Id.* EJLD Defendants argue that such terms are common expressions "of the danger that Mr. Asante-Chioke posed to the officers present." (Rec. Doc. 213, at 16). LSP Defendants agree, and they also argue that such a characterization is an established fact. (Rec. Doc. 218, at 16).

The Court recognizes that experts may not render legal conclusions. *Renfroe v. Parker*, 974 F. 3d 594, 598 (5th Cir. 2020). In the qualified immunity context, whether Mr. Asante-Chioke was a threat is relevant to the objective reasonableness of the force used by the shooting officers. An officer's use of deadly force is considered excessive and unreasonable "unless the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer[s] or to others." *Roque v. Harvel*, 993 F. 3d 325, 333 (5th Cir. 2021) (internal citation omitted). By opining that Mr. Asante-Chioke is a "threat," "imminent threat," or "imminent deadly threat," Mr. Martin is impermissibly answering a legal question for the jury. Furthermore, such testimony "would risk inappropriate bolstering and undue prejudice." *Joseph v. Doe*, No. 17-cv-5051, 2021 WL 2313475, *5 (E.D. La. June 7, 2021). Accordingly, the Court will exclude all references to Mr. Asante-Chioke being a "threat."

16

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's *Motion to Exclude the Testimony of Thomas Martin* **(Rec. Doc. 205)** is **GRANTED in part** and **DENIED in part** as follows.

Mr. Martin may testify as an expert in this case with the following limitations: Mr. Martin may not render any opinions concerning officer field of vision, each officer's different visual perspective, or the difference between what an officer sees and what body cam footage captures; Mr. Martin may not opine on how officers are trained to focus when firing their weapons and how this affects their field of vision; Mr. Martin may not opine on studies concerning perception-reaction time; lastly, Mr. Martin may not opine on whether Mr. Asante-Chioke was a threat to the shooting officers.

New Orleans, Louisiana, this 5th day of January, 2026.

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE